## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-902


NEIL LEJEUNE

VERSUS

RODNEY DRIGGERS


**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 72349-B
HONORABLE GARY J. ORTEGO, DISTRICT JUDGE

**********

## MARC T. AMY
## JUDGE

**********

Court composed of Marc T. Amy, Shannon J. Gremillion, and Candyce G. Perret, Judges.

**AFFIRMED.**


**John F. Craton**
**Barousse & Craton, LLC**
**Post Office Box 1305**
**Crowley, LA   70527-1305**
**(337) 785-1000**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Neil LeJeune**

**Jacque B. Pucheu, Jr.**
**Pucheu, Pucheu & Robinson**
**Post Office Box 1109**
**Eunice, LA   70535-1109**
**(337) 457-9075**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Rodney Driggers**

**AMY, Judge.**

By this boundary action, the plaintiff sought a declaration of ownership by acquisitive prescription of adjoining tracts of property in Evangeline Parish. The defendant alleged ownership by record title. Following trial, the trial court found merit in the plaintiff's claim of acquisitive prescription and additionally rejected the defendant's claim of record title of one of the subject tracts. The defendant appeals. For the following reasons, we affirm.

### Factual and Procedural Background

Neil Lejeune filed this boundary action in March 2011 asserting ownership by acquisitive prescription of three tracts of adjoining property in Evangeline Parish. The record reflects that the three tracts were, at one time, part of the operations of the Rock Island, Arkansas and Louisiana Railroad. The plaintiff asserts that, after the railroad ceased operations in the 1970s, he, along with his ancestors in title, Errol and Dwight Young, incorporated the railroad property into the existing farming operations on either side of the disputed tracts. The plaintiff asserted that they possessed the property in excess of thirty years by "maintaining the vegetation, storing equipment on said land, and maintaining a fence on said land." The plaintiff sought establishment of the boundary to the extent of his possession.

The plaintiff named Rodney Driggers as a defendant in the litigation, noting that Mr. Driggers "[r]ecently . . . placed a chain across a gate in an attempt to lock the fence wherein plaintiff herein has had continuous possession of this land for more than thirty (30) years." The plaintiff denied that the defendant physically possessed or controlled the property.

In turn, the defendant asserted that he was the title owner of the property, having purchased certain property in Evangeline Parish from the railroad in 1985 as

purportedly represented by quitclaim deed. By that deed he acquired all "of Grantor's right, title and interest, estate, claim and demand" of:

> A strip of land of varying widths constituting the former line of railroad and associated station grounds, yards, depots, stock pens, coaling and watering sites and borrow pits as same are evidenced, monumented and located through the following described areas . . . .

The deed thereafter describes with particularity the property conveyed.[1]

The matter proceeded to a March 2017 bench trial, where the parties stipulated to various issues before the court. By reference to a corresponding survey entered into evidence as Joint Exhibit 1,[2] the parties identified the three tracts originally contested: Tract 4 (identified "as the west half of the railroad right of way"); Tract 5 (identified as "the [e]ast half of the railroad right of way"); and Tract 6 (identified as "the deed property"). In reciting the parties' stipulation as to Tract 6, the trial court noted that it was comprised of "two tracts . . . sold to the railroad originally." Importantly, the parties stipulated that Tract 4 was no longer in dispute, representing that "the ownership of Tract No. 4 is stipulated to be that of the plaintiff, Mr. and Mrs. Neil Lejeune."

Following two days of testimony, the trial court declared the plaintiff and his wife to be the owners[3] of "Tracts #5 and #6, along with Tract #4, as stipulated by the

---

[1] As discussed below, the defendant notes that the deed further provides:

> The description contained herein notwithstanding, the intent of this document is to convey all right, title and interest of the Grantor wherever evidenced, monumented or located in the Parish aforesaid, less and except any prior conveyances.

[2] Used extensively throughout the trial, Joint Exhibit 1 is entitled "Errol and Dwight Young Survey" by Paul N. Fontenot, Registered Land Surveyor.

[3] In reasons for ruling, the trial court noted that the defendant filed only a general answer, but explained that:

> [P]ursuant to the defendant's presentation of said evidence at the first day of trial, without objection by the attorney for plaintiff, the court allowed said evidence, as an expansion of the parties' pleadings, even though same was not properly pled by defendant, and therefore the issue(s) as to the possession and ownership of the said tracts/land in dispute, as to both parties, was allowed as properly before the court.

parties, all located in Evangeline Parish in full ownership against all others." The trial

court specifically found that the defendant failed to prove title to Tract 6. Rather, the

trial court referenced "other public records and documentary evidence[,]" including

parish parcel listings, oil and gas leases, and tax notices favored the plaintiff. On this

latter point, the trial court pointed to the plaintiff's payment of property taxes on

Tracts 5 and 6.

Regarding the plaintiff's claim, the trial court further explained:

[T]hat *even* hypothetically should this court have found that Driggers had proven having a valid/good title to both Tract #5 and #6, which the court did not, the court finds, as a finding of fact, that the plaintiff, Lejeune, has proven by a preponderance and overwhelming evidence showing and providing proof that Mr. Young, as plaintiff's ancestor in title, and Lejeune, by tacking, have had actual corporeal possession of these two tracts in dispute, and the court further finds that Lejeune has carried his burden of proof and proven his claim of acquisitive prescription of these two tracts in dispute, all pursuant Lejeune and his ancestors in title, Young's continuous, peaceful uninterrupted actual and public possession of said two tracts of land in dispute, and all pursuant to Lejeune and his ancestor in title, Young, maintaining their continuous daily farming operations, along with the many other activities of possession, as to said tracts/land in dispute, specifically Tracts #5 & #6 for over 30 plus years, and specifically from 1980 until the Driggers' 2011 disturbance and this resulting litigation filed herein.[4]

The resulting judgment reflected the declaration of the ownership as discussed in the

reasons for ruling, describing with particularity each of the three tracts at issue in the

---

[4] Notwithstanding its observation as to Tract 6, the trial court further found that the defendant failed to prove continuous, peaceful, and uninterrupted possession of the disputed tracts for 10 years. *See* La.Civ.Code art. 3475 (providing that "[t]he requisites for the acquisitive prescription of ten years are: possession of ten years, good faith, just title, and a thing susceptible of acquisition by prescription); La.Civ.Code art. 3476 (providing that "[t]he possessor must have corporeal possession, or civil possession preceded by corporeal possession, to acquire a thing by prescription. The possession must be continuous, uninterrupted, peaceable, public, and unequivocal.") Corresponding with its finding regarding the plaintiff's possession, the trial court noted the possession continued "without interruption during those same 10 plus years as claimed by Driggers' possession herein."

boundary action. *See* La.Civ.Code art. 792;[5] La.Civ.Code art. 794.[6] *See also* La.Code Civ.P. art. 3693.[7]

The defendant appeals, asserting that the trial court erred in: 1) finding that he failed to demonstrate that he held title to Tract 6; 2) not admitting impeachment documentation as to the plaintiff's testimony (subject of Proffer No.1); 3) finding that the plaintiff and his ancestors in title acquired Tract 5 by corporeal possession of thirty years; 4) failing to find tacit acknowledgement of his ownership; and in 5) finding that the plaintiff's ancestors in title possessed the disputed tracts within visible bounds and, in turn, that he "tacked" that possession.

## Discussion

*Proffered Testimony*

Taking the defendant's assignments of error out of turn for discussion, we first consider the only procedural issue presented. During trial, the plaintiff testified regarding his presence at an August 11, 1989 meeting conducted at the law office of J. Nilas Young. Both parties advanced their description of the meeting in support of their respective positions as to whether possession was interrupted or whether the defendant's ownership was acknowledged by the plaintiff's ancestors in title. The plaintiff testified that he attended the 1989 meeting at the request of Errol Young.

---

[5] Article 792 provides that: "The court shall fix the boundary according to the ownership of the parties; if neither party proves ownership, the boundary shall be fixed according to limits established by possession."

[6] Article 794 provides that:

> When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along those bounds.

[7] Article 3693 provides: "After considering the evidence, including the testimony and exhibits of a surveyor or other expert appointed by the court or by a party, the court shall render judgment fixing the boundary between the contiguous lands in accordance with the ownership or possession of the parties."

However, during the defendant's testimony, he denied the plaintiff's presence at the meeting. For the stated purpose of corroborating his own testimony, the defendant attempted to introduce the attorney's bill from the date of the meeting. He asserted that the billing record reflected the meeting's attendees. However, the trial court rejected the introduction of that evidence, permitting a proffer instead.

Here, the defendant challenges that ruling and argues that the evidence was admissible as relevant. He suggests that the document provided objective evidence of his version of events at the August 1989 meeting and, in turn, his testimony regarding that meeting constituted acknowledgment by the Youngs of his ownership so as to interrupt prescription.

Following review, we leave the trial court's ruling undisturbed. While the defendant suggests that the billing record, issued to Errol and Dwight Young, was relevant as to the meeting's attendees, the trial court rejected that argument stating:

> This is not a bill to Mr. Driggers. It is a bill and it speaks for itself, attorney's fees for services rendered and cost incurred in reference to a…a bed…railroad bed dispute with Rodney L. Driggers, May 4, 1988 thru September 15, 1989 and it says on there, Mr. Errol Young and Mr. Dwight Young. That's their bill. They're not parties to this litigation…uh…but as far as it being written verification as you're offering it that's gonna be for the Judge to decide but that…that…it does not present to the Court written…anything written confirming that…that who was there and who's not there.… A billing of it…of itself being offered as evidence of who was at the meeting will not be allowed[.]

Louisiana Code of Evidence Article 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation." Conversely, "[e]vidence which is not relevant is not admissible." *Id.* While Mr. Driggers advances the evidence as relevant, the trial court rejected the argument that the document related to the proposition for which it was advanced, as seen above. On this point, La.Code Evid. art. 401 defines "relevant evidence" as that "having any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Absent an abuse of discretion, a trial court's ruling as to relevance will not be disturbed on appeal. *Quibodeaux v. Med. Ctr. of Sw. La.*, 97-204 (La.App. 3 Cir. 3/6/98), 707 So.2d 1380, *writ denied*, 98-0926 (La. 5/15/98), 719 So.2d 465.

Given the trial court's observations and the nature of the proffered billing document, we find no abuse of discretion in the trial court's determination and leave its ruling undisturbed. Both parties offered differing accounts of the August 1989 meeting, with the defendant denying the plaintiff's presence at that meeting. While the defendant suggests that the document corroborates his version of events, reference to the document does not dictate such a finding. The multi-entry document instead supports the trial court's conclusion that it did not evidence "written confirmation" of the meeting's attendees and was instead, a bill issued to the attorney's clients.

This assignment of error lacks merit.

*Acquisitive Prescription of Thirty Years – Tract 5*

As revealed in the above-excerpted reasons for ruling, the trial court determined that, even assuming for purposes of discussion that the defendant established that he was the title holder of Tracts 5 and 6, the plaintiff sustained his burden of proving acquisitive prescription. By this assignment of error, the defendant challenges that determination as to Tract 5, designated by the party's stipulation as the east half of the railroad right-of-way. The defendant notes that testimony indicates that, during the railroad's operation, fences separated the tract from the surrounding property in order to keep cattle from the area. He contends, however, that the plaintiff testified that he

6

did not remove the fencing until 1982,[8] a date the defendant contends "was the beginning date for any acquisitive prescription claim of thirty years." As the plaintiff filed the present action in 2011, the thirty-year period "would not lapse until one year after the litigation was filed" according to the defendant's argument. He further contends that, even to the extent the plaintiff may be said to have "tacked" the possession of his ancestors in title, Errol and Dwight Young, their possession must be viewed as equivocal rather than unequivocal and uninterrupted.

After review, we maintain the trial court's ruling. Pertinent to this matter in which the plaintiff asserts ownership strictly by acquisitive prescription,[9] La.Civ.Code art. 3486 provides that: "Ownership and other real rights in immovables may be acquired by the prescription of thirty years without the need of just title or possession in good faith." Additionally, "[f]or purposes of acquisitive prescription without title, possession extends only to that which has been actually possessed." La.Civ.Code art. 3487. Central to the defendant's inquiry in the second component of this assignment of error, which addresses the nature of the plaintiff's possession, La.Civ.Code art. 3476 describes the attributes of possession as follows:

> The possessor must have corporeal possession, or civil possession preceded by corporeal possession, to acquire a thing by prescription.
>
> The possession must be continuous, uninterrupted, peaceable, public, and unequivocal.

The party claiming acquisitive prescription has the burden of proving such possession and must establish that he or she intended to possess the property as owner. *See Crowell Land & Mineral Corp. v. Funderburk*, 96-1123 (La.App. 3 Cir. 3/5/97), 692

---

[8] The plaintiff testified that he removed fences from the west and east property lines of the railbed in "[p]robably '81[.]" While he did not know on which tract of land the fences were located, he said that "they were meant to keep the cattle off the railroad[.]"

[9] Louisiana Civil Code Article 3446 provides that "[a]cquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time."

So.2d 535. A trial court's finding regarding possession is a factual determination that will not be disturbed on review unless manifestly erroneous. *Id.*

Finally, insofar as the plaintiff is the owner of the surrounding farmland and instituted this matter as a boundary action, La.Civ.Code art. 794 provides that:

> When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds.

As noted by the defendant in this assignment of error, the plaintiff's claim in this acquisitive prescription matter is dependent on the possession by the plaintiff's ancestors in title. On this point, the record indicates that, at one time, the larger surrounding property was owned in indivision by Dwight and Errol Young. However, Dwight and Errol partitioned that property in February 2002. By the partition, Errol accepted "Tracts 5 and 6, containing 2.55 acres and 4.42 acres[,]"[10] whereas Dwight accepted "Tract 4, containing 3.92 acres."[11] The partition also indicated that: "Appearers declare that Tracts 4, 5 and 6 represent portions of the former Railroad Right-of-Way and appearers do not warrant title as to same, but do warrant title in and to the remaining tracts received by each in this partition." Although the plaintiff was the longtime tenant of Errol and Dwight on the larger property, Dwight transferred his property, including Tract 4, to the plaintiff and his wife in December 2007 by Act of Donation. Thereafter, in March 2013, the plaintiff and his wife purchased Errol's property, including Tracts 5 and 6.[12]

---

[10] Errol further accepted "Tract 1, containing 70.71 acres" and "Tract 3, containing 19.92 acres[.]"

[11] Dwight also accepted "Tract 2, containing 109.98 acres."

[12] We note here that the plaintiff confirmed during cross examination that he filed the 2011 petition instituting this matter before he owned Tracts 5 and 6.

As for the possession of Tract 5, the tract at issue in this assignment of error, the defendant suggests that, due to the presence of certain fences along the abandoned railway, the plaintiff's possession could not have commenced until 1982. However, the record supports the trial court's finding that the plaintiff's possession commenced earlier than that date. The plaintiff's wife, Elizabeth Lejeune, testified that, beginning in the late 1960s, she lived "about maybe a quarter of a mile if that" from the property with her step-father, Errol, and that her "[school] bus passed by there every day when we crossed the railroad tracks." Although she recalled original fencing between the adjacent cropland and the railroad, she explained that about a year or so after moving to the area, Errol "had gotten a um…a dozer…a blade on his…he was real excited about it but he could move dirt and uh…he went out there and he took the fence down and…and incorporated the rest of the field right there."

According to the plaintiff, he first became aware of the abandoned railroad track in early 1976, when Errol explained to him that he and Dwight were meeting with an individual "to find out what to do with the abandoned railroad track." The plaintiff testified that Errol told him that he "and Dwight had built fences on the north end and the south end and they were to keep the gates closed at all times." The plaintiff stated that, although "[t]here was [sic] already fences on the east and the west[,]" they "just fenced off both ends and they would've done that in very early '76[.]" The plaintiff also testified that: "[H]e did mention it to me that they had done it and that if I would go to make sure I closed the gates, keep the gate up on the south end." Further, when asked when he first began working on railroad property, the plaintiff explained that he, his brother, and their father asked "Errol for the . . . ballast, the sand and the gravel and everything that was on there. So we started probably in mid '77 loading the gravel on the truck and hauling it back to the house." The

9

plaintiff stated that "the rails and the timbers were all removed by the time we started." The plaintiff explained that, by 1981, he and Errol began discussing the usage of the former railroad bed as an airstrip, as detailed below. In light of this evidence of the Youngs' installation of gates for purposes of intentionally enclosing the property and their granting of permission to others for the removal of materials from the property, we conclude that the record supports the trial court's determination that the plaintiff's ancestor in title commenced possession of the property well before the 1982 date referenced by the defendant.

As to the second component of the defendant's argument, the record further supports the trial court's determination that the plaintiff's possession had the attributes of continuous, uninterrupted, peaceable, public, and unequivocal possession as required by La.Civ.Code art. 3476. In addition to the circumstances surrounding the enclosure created by Errol and his brother in the 1970s and the early removal of the former railroad materials, much of the testimony at trial focused on the use of Tract 5 as an airstrip. Elizabeth and the plaintiff both explained that Errol felt that the former railroad bed would make a good airstrip. The plaintiff testified that, after construction in 1981, they began using Tract 5 as an airstrip in "probably '82 or '83."[13] He confirmed that Errol and Dwight, who continued to own the farm, "agreed" with the use of the airstrip and that "it was all part of what we needed to…to operate the farm, Errol and Dwight's farm and then Paul was also farming the Fontenot farm further down the road and he would use it for that . . . he had a farm also he was using it for." The plaintiff explained that a drainage project was completed across Tract 5 with Errol and Dwight purchasing the pipe. Also, various pilots confirmed their use of the

---

[13] The plaintiff testified that he and his brother began farming the property as Errol and Dwight's tenants in 1980 and, after 1982, he and Elizabeth did so.

airstrip for agricultural purposes, beginning in 1982. Not only did the pilots service the Youngs' fields, but pilots used the airstrip for other area farmers as well.

While the defendant suggests that the other pilots' usage interfered with the Youngs', and in turn, the plaintiff's, continuous, uninterrupted, and unequivocal use of Tract 5, testimony indicated that the pilots and farmers did so with the knowledge of the plaintiff and/or Errol and Dwight. Robert Lejeune, the plaintiff's nephew, testified that he began flying from the airstrip in 1997 and, by the date of trial, had used the airstrip over a thousand times. He further explained that, among other things, he assisted with the maintenance of the strip, including weekly grass clipping, the placement of a concrete pad, a 2000-gallon water tank, and a water meter on the property for the pilots' use. Robert confirmed that his use was with the knowledge and permission of Neal, Errol, or Dwight. Similarly, the plaintiff testified that other users of the airstrip property assisted with maintenance, stating that they did so as a "kind of like a thank you for using the airstrip."

While the defendant's assignment questions the continuous, uninterrupted, and unequivocal nature of the plaintiff's possession, we note here that the record also supports the remaining attributes of possession listed by La.Civ.Code art. 3476. First, the plaintiff's possession was peaceable. While Errol and Dwight, along with the plaintiff, became aware of the defendant's claim of ownership in 1988-1989,[14] a point discussed below, the trial court determined that such notification did not constitute a disruption sufficient to interfere with their peaceable possession. Further, and given the agricultural community's obvious knowledge and permissive use of the airstrip, the plaintiff's possession was public in nature. In sum, this evidence supports the trial

---

[14] The defendant points to an August 1989 meeting as the purported point of interruption in the plaintiff's and the Youngs' possession. However, the record indicates that the Youngs became aware of a pilot being ordered from the property in 1988. Also, correspondence leading to the 1989 meeting commenced in 1988.

11

court's ultimate finding that the plaintiff's possession was continuous, uninterrupted, peaceable, public, and unequivocal.

This assignment lacks merit.

*Record Title – Tract 6*

Although the defendant challenges the trial court's determination regarding acquisitive prescription as to Tract 5, as discussed above, the defendant returns to his claim of record title to Tract 6 and argues that the trial court erred in concluding that he was not the title holder of that portion of the property. The trial court determined that:

> The court has carefully reviewed all of the deeds, court orders, transfers and documentation of conveyance(s) presented by Driggers as to his alleged title and the "chain of title" of his ownership of these two tracts in dispute. A review of the defendant's chain of title reflects and there appears to be a question and an error in the transfer and title to one of the two tracts in dispute, and specifically, as to Tract #6.
>
> . . . .
>
> A careful review and reading of Driggers' quitclaim deed, specifically identifies and shows a listings [sic] for Tracts #4 & #5, as identified, marked and highlighted by Driggers. However, a reading of said deed appears to lack any description for Tract #6, in the itemized listing of all tracts transferred to Driggers therein. As further evidence of the failure of said quitclaim deed to contain a listing and transfer of Tract #6 was the testimony of the defendant. When questioned, Driggers testified and confirmed that he nor his attorney could find or point-out, for the record, any specific listing which would correspond with the description of Tract #6 in the listing(s) of the properties described and transferred to Driggers in said quitclaim deed. Therefore, and as a result thereof, and specifically as to the issue of Driggers' title to Tract #6 of the property in dispute, the court finds, as a finding of fact, that in fact the description and listing of Tract #6 to be missing and the parties to said deed failed to list and transfer said Tract #6; and thus the reading of said deed appears to confirm that the parties failed to transfer said Tract #6 from Chicago Pacific Corporation to Driggers in said Quitclaim Deed. The court therefore further finds that Driggers he has failed to carry his burden of proof of a good/valid title as to Tract #6, and he has failed to provide evidence sufficient as to title to Tract #6 in dispute herein.

(Exhibit citation omitted.)

Review of the quitclaim deed confirms the trial court's observation that, although Tracts 4 and 5 are included in the itemized listing of transferred parcels, Tract 6 is not. The defendant instead lodges his claim of title to the deed inclusion by reference to what he terms the deed's "catchall phrase[,]" which provides that: "The description contained herein notwithstanding, the intent of this document is to convey all right, title and interest of the Grantor wherever evidenced, monumented or located in the Parish aforesaid, less and except any prior conveyances." However, and notwithstanding the general nature of the language relied upon by the defendant, the trial court further observed that the defendant failed to demonstrate that "he had peaceful continuous uninterrupted possession of said Tract #6 for a period of 10 years prior to this litigation" for purposes of his own acquisitive prescription of the property. *See* La.Civ.Code art. 3475. The trial court also found that the plaintiff had proven his own acquisitive prescription of the disputed property, including Tract 6. This latter finding renders moot the defendant's claim by virtue of the quitclaim deed.

Further, and like Tract 5, the record supports the trial court's determination that the plaintiff, by tacking, possessed Tract 6 in excess of thirty years. Notably, the testimony was uncontroverted that Tract 6 was incorporated into the surrounding farming operations and was planted with crops. As pointed out above, Elizabeth testified that Errol removed fencing and incorporated the area into the existing field. Testimony further indicated that the airstrip of Tract 5 was narrowed over the years, with the crops surrounding the strip on either side. The defendant presented no evidence to contradict the evidence of continuous farming on Tract 6.

Accordingly, this assignment lacks merit.

*Acknowledgment*

By this assignment, the defendant again advances his position that the period of acquisitive prescription was interrupted by acknowledgment of the plaintiff's ancestors in title, Errol and Dwight, in August 1989. That time period relates to the meeting with the Youngs' attorney, Nilas Young, as discussed above in connection with the proffered billing statement. The defendant contends that the trial court erred in failing to credit his account of the meeting, as well as correspondence generated during the time period of meeting. His version, the defendant asserts, reveals the Youngs' acknowledgement of his ownership of the property.

Acquisitive prescription is interrupted by the filing of suit, by acknowledgment, or when possession is lost. *See* La.Civ.Code art. 3462; La.Civ.Code art. 3464; La.Civ.Code art. 3465. As pertinent to the defendant's claim, La.Civ.Code art. 3464, provides that: "Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe."

Regarding the August 1989 meeting at Nilas Young's office, the defendant contends that only he, Errol, Dwight, and Nilas Young were present at the meeting. He denied that the plaintiff was in attendance. He testified that, during the meeting at which he offered to sell his interest in the property to Errol and Dwight, the men stated that they had no interest in purchasing the property, but that "they would get off and leave my property alone and make sure that there weren't any more planes on it and we agreed." He asserts that this series of events is confirmed by correspondence admitted into evidence and which he finds supportive of his view of acknowledgment.

Contrarily, the plaintiff testified that Errol asked him, as the property's tenant farmer, to attend the meeting regarding the claim of ownership so that he would be aware of matters pertaining to the property. The plaintiff explained that, by the time

of the meeting, Errol always consulted him and Elizabeth with regard to decision making. Describing the meeting, the plaintiff denied that either Errol or Dwight stated that the property was that of the defendant or that they would cease their use of the property. Rather, the plaintiff testified that: "Towards the end of the meeting uh…Mr. Errol just kind of put his head down and he sa[id] uh…Mr. Driggers I'm…I'm not gonna buy what I already own and if you want it take me to Court in Ville Platte, take it away from me and that [was] basically how the meeting ended[.]" The plaintiff further denied that he was told afterwards to change the way he was using the property. He explained instead that: "Absolutely nothing changed."[15] He stated that he next heard from the defendant in 2011, when he found the gate to the airstrip locked and a "For Sale sign" placed by the roadway.

In assessing the conflicting testimony, as well as surrounding correspondence, the trial court concluded in reasons for ruling that:

> [A] review of the totality of the testimony and evidence as to said 1989 meeting, along with the activities, the several letters and discussions all leading thereto, the court finds that the said meeting was merely a gathering of the parties, wherein Driggers offered to sell Young, as plaintiff's ancestor in title, these original three tracts of land, and that of Young's specific refusal to purchase same from Driggers and responding something to the effect of "why should I buy what I already own?". Driggers further testified that after that 1989 meeting he suffered a major heart attack and as such Driggers acknowledge[s] that he never went back to visit or participate in any activities as to these tracts in dispute, and that he just "left things alone" for another 10 plus years from 1989 to 2011. Therefore, and as to the issue and question as to this meeting in 1989, the court finds, as a finding of fact, that in fact this meeting, along with the telephone calls, activities, letters and discussions leading thereto, are not sufficient to establish any disturbance and/or activities of possession by Driggers as against the continuing possession and farming operations of Young and Lejeune therein.

---

[15] Elizabeth also testified regarding the plaintiff's attendance at the meeting and that she recalled the plaintiff discussing the meeting when he returned home. She explained that there had been no changes in the way the property was used after the meeting and that it had been used without interruption after that date.

Following review, we find that the record supports the trial court's factual findings. In addition to the clear credibility determination in favor of the plaintiff's account by which his ancestors in title maintained their position as owners, the correspondence entered into evidence reflects only the defendant's claim of ownership and the series of exchanges occurring prior to the August 11, 1989 meeting. In fact, the final letter in the exchange commemorated the Youngs' claim of ownership. By letter dated June 29, 1989, Nilas Young wrote to the defendant, explaining:

> I have discussed your letter of June 7, 1989, with Mr. Dwight Young and Mr. Errol Young. They have concluded that the property you claim to have a deed for and which the railroad got by Warranty Deed is property North of their property and until your surveyor shows them otherwise, they feel that they are entitled to the property adjacent to theirs which was abandoned by the railroad which the railroad was using by virtue of a servitude.

> If you have other evidence, I would suggest that you call me for a meeting with the Youngs and myself and we will try to amicably resolve this matter. Perhaps such a meeting could resolve this problem and save possible litigation.

While the defendant contends that the trial court should have accepted a billing record from Nilas Young, which the defendant contends corroborates his version of events, we have maintained the trial court's ruling above.

This assignment lacks merit.

*Ancestors in Title – Tacking*

Finally, the defendant asserts that the trial court erred in finding that the plaintiff was able to prove acquisitive prescription by tacking the Youngs' possession of the property to his subsequent possession. In addition to his argument that there was no identifiable boundary between Tract 6 and the plaintiff's property to the east, he also contends that the plaintiff was merely a tenant farmer at the time he filed suit and could not, therefore, have acquired the property by acquisitive prescription. We take each argument in turn.

16

First, and with regard to the necessity of a visible boundary, La.Civ.Code art. 794 provides that: "When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, *within visible bounds*, more land than their title called for, *the boundary shall be fixed along these bounds.*" (Emphasis added.) While the defendant contends that the plaintiff's claim fails as "[t]here was no visible boundary between [Tract 6] and the Youngs' field to the east, nor was there any visible boundary after 1982 with regard to [Tract 5] after Mr. Lejeune removed all fences[,]" the evidence reveals otherwise. Rather, the record establishes both that Tract 6 was incorporated into the Youngs' farmland to the east, stopping at the edge of the airstrip. In turn, the Youngs established and maintained the airstrip from the edge of their cropland to the west to the edge of the cropland to the east. The airstrip was maintained between each of these areas of farmland. The trial court's resulting judgment was in keeping the fixing of the boundary "along these bounds[.]"

Neither do we find merit in the contention that the plaintiff could not tack the possession of his ancestors in title insofar as he was a lessee at the time of the interruption, i.e., the filing of suit. In support of this argument, the defendant cites La.Civ.Code art. 3477, which provides that: "Acquisitive prescription does not run in favor of a precarious possessor or his universal successor." However, the instant matter is not one in which either the Youngs or, subsequently, the plaintiff could be said to have been precarious possessors of the defendant. Instead, and specific to this boundary action, La.Civ.Code art. 794, anticipates the possession of "a party and *his ancestors in title*[.]" (Emphasis added.) The supreme court has explained that, in a boundary action arising under Article 794, title between a possessor and his ancestor

in title does not need to extend to the property for which the possessor asserts acquisitive prescription. *Loutre Land and Timber Co. v. Roberts*, 10-2327 (La. 5/10/11), 63 So.3d 120. Rather, in such an action, "one may utilize tacking to prescribe beyond title on adjacent property to the extent of visible boundaries[.]" *Id.* at 125.[16]

In this case, the entirety of the plaintiff's possession up until the time of the interruption of the filing of the 2011 suit was through the possession of the Youngs, whether both Dwight and Errol or, after partition, by Errol, insofar as the plaintiff did not purchase the property from Errol until 2013. While the defendant contends that the plaintiff could not have possessed as owner, which he alleged in his petition, the evidence is clear that, at all times while a tenant farmer, he was maintaining the farming practices as conveyed to him by the Youngs. *See* La.Civ.Code art. 3429 (providing that "[p]ossession may be exercised by the possessor or by another who holds the thing for him and in his name. Thus, a lessor possesses through his lessee.").

This assignment lacks merit.

### DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to the defendant – appellant, Rodney Driggers.

**AFFIRMED.**

---

[16] In its discussion, the supreme court contrasted La.Civ.Code art. 794 to the general prescriptive articles of La.Civ.Code arts. 3441 and 3442, whereby "tacking may be utilized to prescribe only to the extent of title." *Loutre Land and Timber, Co.*, 63 So.3d at 125.